UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION

NO. 4:09-CR-00071-H-1

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM &** |
| | ) | **RECOMMENDATION** |
| JOVANNY PENA, | ) | |
| | ) | |
| DEFENDANT. | ) | |

This matter is before the Court on two motions of Defendant, Jovanny Pena ("Pena" or "Defendant"), to suppress evidence seized subsequent to a police stop and search of a vehicle driven by Defendant. [DE-16 & 17.] The Government filed a response in opposition to the motions. [DE-19.] To further develop the record, the Court conducted an evidentiary hearing on November 12, 2009, at which the Government and Defendant with counsel appeared. This matter is now ripe for decision.

## I.    STATEMENT OF THE CASE

On August 6, 2009, a Federal Grand Jury charged Defendant in a two count indictment. Count One charged that "On or about March 12, 2008, in the Eastern District of North Carolina and elsewhere, the defendant, JOVANNY PENA, did knowingly and with the intent to defraud, possess fifteen or more devices, to wit: credit cards and account numbers, which are counterfeit and unauthorized access devices, said conduct having an effect on interstate commerce, in violation of Title 18, United States Code, Section 1029 (a) (3)." Count Two charged that "On or about March 12, 2008, in the Eastern District of North Carolina and elsewhere, the defendant, JOVANNY PENA, did knowingly transfer, possess, and use, without lawful authority, a means

of identification of another person, to wit: a name, social security number, and date of birth, during and in relation to the access device fraud charged in Count One, in violation of Title 18, United States Code, Section 1028A. [DE-1.]

Defendant first moved to suppress all evidence seized based on the assertion that the stop of his vehicle was unreasonable and violated the Fourth Amendment. [DE-16.] Defendant then filed a second motion to suppress the same evidence based on the additional theories that Defendant did not consent to the search, that any purported consent was coerced, and that any purported consent was tainted by the illegality of the initial stop. [DE-17.] The Government contends that reasonable grounds for the stop existed and that Defendant gave valid consent to search the vehicle. [DE-19.]

## II.    STATEMENT OF THE FACTS

At the evidentiary hearing on November 12, 2009, John Taylor ("Officer Taylor"), a police officer with the Roanoke Rapids Police Department, and Defendant Jovanny Pena both testified as to the traffic stop and search that took place on March 12, 2008. The Court also viewed and entered into evidence a video recording of the traffic stop, which was taken from a camera in Officer Taylor's vehicle. The Court finds the following facts based on the testimony of each witness and the video recording of the traffic stop.

Officer Taylor routinely patrols a three mile stretch of Interstate 95 in Halifax County. On Wednesday morning, March 12, 2008, Officer Taylor was patrolling this area and pulled alongside a white Dodge Neon. The Neon's windows were heavily tinted. Officer Taylor could barely make out the driver's silhouette and could not determine whether the driver was wearing a seat belt. Officer Taylor explained during the hearing that vehicles registered in North Carolina must comply with the state's window tint law, which he understood to require that 35% of light

must be able to pass through the window. If a vehicle is registered in another state and complies with that state's window tint law then there is no violation of North Carolina law even if the tint does not allow 35% light transfer. Officer Taylor commonly stops vehicles and gives written warnings for window tint violations. He carries in his patrol car a reference sheet, issued by the International Window Film Association, which he believes states the window tint laws for each state. See Gov't Ex. 1.

After observing the Neon's darkly tinted windows, Officer Taylor fell back behind the Neon to check the vehicle's registration and consider whether the vehicle violated the window tint law. The Neon was registered in Florida. Officer Taylor testified that he was familiar with the Florida window tint law, which he understood to require that 28% of light must be able to pass through the window tint. Officer Taylor stated that, based on his experience, the Neon's window tint was much too dark to comply with any state's window tint law. He proceeded to initiate a traffic stop by turning on his blue lights. The Neon continued for approximately one half mile before exiting and pulling to the shoulder at approximately 7:18 a.m.

Officer Taylor approached the vehicle on the passenger's side and for the first time saw a second occupant in the passenger seat of the Neon, who was later identified as Bryna McLaughlin. Officer Taylor identified himself, stated that he had stopped the vehicle because the window tint was too dark, and requested a license and registration. The driver, Jovanny Pena, explained that his license was not valid and produced a student identification card. Officer Taylor asked McLaughlin if she had a license. When she opened her purse to retrieve her license, Officer Taylor observed what appeared to be several identification cards. McLaughlin produced a Florida driver's license.

Officer Taylor then asked Pena to come back to the patrol car so that Taylor could look up his license. After Pena exited the Neon, Officer Taylor asked him if he had any weapons, conducted a pat down search, and directed Pena to get into the front passengers seat of the patrol car. While Officer Taylor looked up Pena's license, he asked Pena some questions about his travels, to which Pena responded that they were travelling to a funeral in New York, that the funeral was the following day, and that he had to be back to work by Saturday. Pena also made small talk about the dangers of truck drivers on the road. Officer Taylor then asked Pena if he had ever been arrested for drug or weapons offenses or anything other than traffic charges. Pena responded, "Forgery, that's about all," and denied any drug or weapons offenses.

Pena next asked Officer Taylor why he had been stopped, to which Officer Taylor replied that he was stopped for the window tint. Pena further asked if he was getting a ticket for the window tint violation. Officer Taylor stated that he was not citing Pena for the window tint, but was giving him a ticket for not having a license. Pena then asked if Officer Taylor would not rather write the citation for the window tint because Pena was already having problems with his job due to his suspended license. Officer Taylor laughed and responded that he would explain to Pena how he could "help himself out" once he finished writing the ticket. Officer Taylor testified that it was his practice to give a citation for the most serious violation and give a warning for other lesser violations.

Officer Taylor continued talking to Pena while completing the license checks on Pena and McLaughlin. He asked Pena if McLaughlin was his wife, to which Pena responded affirmatively. When questioned as to why her last name was different, Pena said they were engaged. Officer Taylor asked Pena what kind of work he did, and Pena responded that he was

4

in construction but wanted to get into truck driving. Officer Taylor then asked Pena for some personal information, such as his social security number.

Officer Taylor testified that by this point he had become suspicious and wanted to confirm that Pena was indeed who he said he was since, in Taylor's experience, student identification of the type produced by Pena was easily manufactured. The fact that it appeared McLaughlin had multiple identification cards in her purse also raised suspicion. Officer Taylor then stopped writing the citation and went back to the Neon to speak to McLaughlin. He asked her who was driving the Neon and she indicated that it was Jovanny Pena. He also asked her where they were going. She stated that they were going to Alexandria, Virginia to visit a friend of hers and then onto New York for a visit because she had heard it was a nice place. McLaughlin further stated that she was not Pena's wife, but that they were dating. Officer Taylor testified that the difference between McLaughlin's and Pena's stories regarding where they were going and for what purpose further heightened his suspicions.

Officer Taylor returned to his vehicle to check for outstanding warrants on both Pena and McLaughlin, which was his common practice. Pena inquired of Officer Taylor if anything was wrong. Officer Taylor responded in the negative and told Pena that he was just checking to make sure there were no outstanding warrants. Officer Taylor then asked Pena if McLaughlin had ever been arrested for anything. Pena answered affirmatively that McLaughlin had a "weed charge" from a traffic stop about five years prior. Officer Taylor then asked if there was any weed in the car at that time, and Pena said no. While Officer Taylor was completing the warrant check, Pena again asked if everything was okay or if something "came-up," and Officer Taylor questioned why Pena was asking. Pena stated that it was because Taylor had said he was "investigating;" Officer Taylor explained that every traffic stop was an investigation. Officer

5

Taylor completed the warrant check and, having determined that there were no outstanding warrants, completed writing the citation for driving without a license.

Officer Taylor explained that he could arrest Pena for driving without a license, but that he was not going to arrest him and was instead going to issue him a citation. He explained the procedures regarding the citation and answered Pena's questions regarding payment of the fine. Officer Taylor again asked Pena if there was any marijuana in his car, to which Pena said no. Officer Taylor then returned Pena's and McLaughlin's identification and said "that's that." The video recording of the stop reflected the time at this point to be 7:37 a.m., approximately 19 minutes after Pena was initially stopped.

Immediately after issuing the citation to Pena, Officer Taylor asked if Pena minded if Taylor searched the vehicle. Pena said, "Sure."[1] A few seconds later, Pena stated that he was in a rush because he was trying to make it to his grandfather's funeral. Officer Taylor responded that he would "make it fast." Pena then asked if he could step outside the car to smoke a cigarette. Officer Taylor asked Pena to wait and stated that he needed him to sign a written consent form. Taylor refused, stating that he did not want to sign the form and that he could not sign the form because it was not his car, it was McLaughlin's car. Officer Taylor then instructed Pena to "sit tight," and Pena responded, "Sure."[2]

---

[1] Defendant's counsel stated at the hearing that Defendant was not taking the position that Pena was denying Taylor's request, as if to say "sure, I mind." Defendant concedes that he initially gave Officer Taylor consent to search the Neon, although he asserts that the consent was not valid for other reasons discussed *infra*.

[2] Officer Taylor initially testified on direct examination that after Pena refused to sign the written consent form, Taylor asked him again if it was still okay to search and Pena responded affirmatively. On cross-examination, Officer Taylor admitted that he did not ask Pena a second time, after he refused to sign the consent form, if it was still okay to search the vehicle. The video tape of the stop confirms that Officer Taylor did not ask Pena if it was still okay to search. Officer Taylor testified that his initial recollection had been wrong and that he had not intended to misrepresent the events.

At this point, a back-up officer, K. Byrd ("Officer Byrd"), arrived at the scene, and Officer Taylor got out of his vehicle to speak with Officer Byrd. Officer Taylor told Officer Byrd that Pena stated they were travelling to New York to a funeral, that McLaughlin stated they were travelling to Virginia first to visit friends and then to New York because she had never been, and that McLaughlin made no mention of a funeral. Officer Taylor described Pena as "extremely nervous." He went on to explain that the Neon belonged to McLaughlin and that he was going to ask for her consent as well, but that Pena had given verbal consent to search and would not sign the written consent form. Officer Byrd then told Officer Taylor that he believed no further consent was necessary, and Officer Taylor returned to his vehicle and instructed Pena that he could get out of the police car to smoke a cigarette.

Officer Taylor approached McLaughlin, who was still seated in the passenger side of the Neon, and asked her if there was anything in the car that she knew about, such as marijuana. She responded that there was not, and Officer Taylor told her that Pena had consented to a search of the car and directed her to exit the vehicle and stand with Officer Byrd. He did not ask McLaughlin for permission to search the car. Officer Taylor began searching the passenger side of the Neon, while Officer Byrd, Pena, and McLaughlin stood a few feet away beside the police car. After Officer Taylor had been searching for one to two minutes, Officer Byrd approached Officer Taylor to ask if he could retrieve a lighter from the passenger door, which Officer Byrd recovered and delivered to Pena.

Officer Byrd, Pena, and McLaughlin then began to talk; after about a minute, Officer Byrd went to Officer Taylor and stated that Pena claimed that he did not give Officer Taylor consent to search. Officer Taylor stated that Pena gave him verbal consent but refused to sign the written consent. Pena continued to deny that he gave Officer Taylor consent, and

7

McLaughlin stated that she did not like what was going on and felt "uncomfortable." Officer Taylor then stopped searching and told Pena and McLaughlin that he would continue his search because he found marijuana residue on the floorboard. Officer Taylor's search rendered approximately 200 items of evidence including one marijuana stem, a half dozen marijuana seeds and flakes, stolen credit cards, bags of stolen jewelry, floor mats, an owner's manual and keys from a stolen vehicle, electronic devices used to read and re-write information on credit and bank cards, stolen passports, stolen mail, and stolen cell phones.

Defendant Pena testified at the hearing that he is 26 years old and completed the 9th grade in school. He was born in New York City where he now resides, but has also lived in Florida. Pena was previously incarcerated in Florida and was assigned to a prison work camp. While working to remove storm debris, a tree limb fell on his head. As a result of this accident, he suffers headaches, has difficulty concentrating, and has a visible 1" x 4" scar on the top of his head.

Pena stated that on the day of the traffic stop he was driving McLaughlin's car. He confirmed that while in the patrol car that he said "sure" when asked by Officer Taylor for permission to search the car. Pena, however, claimed that at the time he agreed to the search he did not fully understand what was being asked of him and that he just wanted to cooperate. He explained that it was not until Officer Taylor asked him to sign the consent form that he understood what Officer Taylor was asking and that he then refused to sign the form because it was not his car. Pena went on to explain that when he and McLaughlin had the opportunity to speak, after Officer Taylor began his search, he discovered that she had not consented to the search. Pena said that he told her he had not consented because it was not his car. At that point

they informed Officer Byrd that neither Pena nor McLaughlin had given Officer Taylor consent to search.

Pena acknowledged on cross-examination that Officer Taylor was cordial, answered all his questions, and did not draw his gun or act in an intimidating manner. He admitted that he did not ask Officer Taylor to rephrase his request to search the car, did not tell Officer Taylor that he did not understand, and did not expressly say "do not search the car." Pena claimed that he was tired because it was 7:45 a.m. and that he did deny Officer Taylor the right to search the car by refusing to sign the consent form. Pena admitted to several encounters with law enforcement and convictions for forgery, grand theft, and providing false information. He claimed that while Officer Taylor's tone or actions were not intimidating, the questions Officer Taylor asked about Pena's criminal history were intimidating.

## III.   DISCUSSION

### A. First Motion to Suppress – Probable Cause to Stop

Defendant first argues that the traffic stop by Officer Taylor was pretextual and not supported by probable cause or a reasonable suspicion of unlawful conduct. He contends that the vehicle he was driving was not in violation of the North Carolina window tint statute and that Officer Taylor should have known there was no such violation. Defendant concludes that because the stop was unlawful, all evidence from the search should be suppressed. The Government contends that the stop was lawful given Officer Taylor's reasonable belief that the vehicle's window tint violated North Carolina law.

> "As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred," regardless of the officer's subjective motivations. Whren v. United States, 517 U.S. 806, 810, 813-19, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) (citations omitted). "[O]nly the probability, and not a prima facie showing, of criminal activity is the

standard of probable cause." Illinois v. Gates, 462 U.S. 213, 235, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) (internal quotation marks and citation omitted).

United States v. Williams, 2009 WL 1991207, at *1 (4th Cir. July 10, 2009) (unpublished op.).

Officer Taylor testified that he was familiar with the window tint law in North Carolina and several other states and that, in any event, the Neon's windows were so darkly tinted that he believed it would be in violation of any state's tint law.[3] Officer Taylor's testimony that when he pulled up beside the Neon he could barely make out the driver's silhouette supports the conclusion that he had probable cause to believe the window tint was too dark and likely in violation of state law. The Court also notes that on the video of the traffic stop, the passenger side window was visible when the passenger door was opened, and the window was so darkly tinted that it appeared to be opaque. It is reasonable for an officer to focus on a more serious violation, *e.g.*, driving without a license, once that more serious violation comes to light. That Officer Taylor did not ultimately cite Defendant for a window tint violation is of no consequence. Id. (concluding that an officer's failure to charge the defendant with illegal window tint or other violations "does not conclusively indicate that the officer did not observe probable violations of those types."). Under these circumstances, Officer Taylor had probable cause to believe a traffic violation had occurred, and the standard is "probability," not a "prima facie showing." See Williams, 2009 WL 1991207, at *1.

The Court recommends that Defendant's first Motion to Suppress be denied.

---

[3] Officer Taylor did test the window tint on the Neon and found that it allowed only 15% light transfer, which appears to be, in fact, a violation of Florida and North Carolina law. See N.C. Gen. Stat. § 20-127 (b)(1), (c)(10); Fla. Stat. § 316.2953.

**B. Second Motion to Suppress – Consent to Search**

Defendant next argues that he did not give valid consent to search the vehicle and that any purported consent was coerced.[4]   He contends that because Officer Taylor had no valid consent to search the vehicle, the evidence seized should be suppressed.   The Government responds that Defendant gave voluntary consent to search the vehicle and that the search was therefore, lawful.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.   "It is well settled under the Fourth and Fourteenth Amendments that a search conducted without a warrant issued upon probable cause is per se unreasonable ... subject only to a few specifically established and well-delineated exceptions." Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973) (internal quotation and citation omitted). Voluntary consent is one such exception. Id. "[W]hether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." Id. at 227.   Consent requires something more than mere acquiescence to apparent lawful authority. Bumper v. North Carolina, 391 U.S. 543, 548 (1968). "In viewing the totality of the circumstances, it is appropriate to consider the characteristics of the accused (such as age, maturity, education, intelligence, and experience) as well as the conditions under which the consent to search was given (such as the officer's conduct; the number of officers present; and the duration, location, and time of the encounter)." United States v. Lattimore, 87 F.3d 647, 650 (4th Cir.1996) (citations omitted).

---

[4] Defendant also asserts that the illegality of the initial stop as a basis for suppression. The Court rejected that argument in Part A, *supra* and will not address it again.

There is no question that Defendant initially consented to the search when he responded "sure" to Officer Taylor's request to search, and the Court finds that the consent was voluntary. The Defendant is an adult and moreover is experienced in dealing with law enforcement from his several previous encounters. While he did not graduate from high school, he was educated through the 9th grade and appeared (based on observation both in court and in the video of the traffic stop) not to be of below average intelligence. Defendant testified that he had sustained a head injury and had trouble concentrating, but Defendant appeared to have no problems understanding Officer Taylor, responded coherently to all his questions, and even asked pertinent questions regarding the citation Taylor issued.

During the entirety of the encounter with Pena and McLaughlin, Officer Taylor maintained a polite tone and made no threats, expressly or implicitly, and Pena even made small talk with Taylor. Officer Taylor never drew his weapon or used physical force against Pena or McLaughlin. Officer Taylor was the lone officer on the scene until one back-up officer arrived, which was after Defendant had already consented to the search. Finally, the traffic stop occurred in full daylight, on the side of a busy interstate off-ramp, and Defendant had been stopped for no more than 20 minutes (not an unreasonable amount of time considering Officer Taylor had to run identification and warrant checks) when Defendant consented to the search.

Defendant argues that he merely acquiesced to the apparent lawful authority of Officer Taylor, "who had informed him that the co-occupant of the vehicle had already consented to the search." Def.'s Second Mot. to Suppress at 4. The Court finds no factual support for this assertion. While Officer Taylor did tell McLaughlin that Pena had consented to a search of the vehicle, it did not appear from the video of the traffic stop, and Defendant did not testify, that Officer Taylor told him that McLaughlin had consented to the search before seeking Defendant's

consent. Furthermore, the case cited by Defendant in support of this argument, Bumper v. North Carolina, is factually distinguishable. Bumper involved an official who obtained consent after asserting that he had a warrant, when in fact he did not. The Supreme Court held that there could be no consent under those circumstances. See Bumper, 391 U.S. at 548. Based on the totality of the circumstances in this case, the Court finds that Defendant did not merely acquiesce, but gave voluntary consent to search the car.

Defendant also argues that he was confused at first when he purportedly consented, and that his refusal to sign the written consent form and his statements to Officer Byrd that he did not consent to the search prove that he did not voluntarily consent to the search. Neither the facts, nor the case law, support Defendant's position. The Court is not convinced that Defendant's later self-serving statement to Officer Byrd, that he did not give verbal consent, proves the truth of that assertion. Defendant showed no indication that he was confused by Officer Taylor's request, and he didn't ask for clarification or ask questions as he had done regarding the citation; he simply said, "Sure." Could Defendant have revoked consent at that point? The answer is unquestionably, yes. See United States v. Lattimore, 87 F.3d 647, 651 (4th Cir. 1996) ("A consent to search is not irrevocable. . . .") (citation omitted). However, it is equally clear that the mere refusal to sign a written consent form is insufficient to revoke prior verbal consent. Id. ("[A] refusal to execute a written consent form subsequent to a voluntary oral consent does not act as an effective withdrawal of the prior oral consent.") (citations omitted).

This is not, however, a straightforward case of mere refusal to sign a written consent form. Defendant went on to state that he *could not* sign the written consent form because it was not his car. Defendant contends that although he first responded "sure" when asked if Officer

13

Taylor could search, the later statement that he could not sign the written consent because it was not his car shows that his real intent was to deny the request to search.

The events that followed Officer Taylor's request for Defendant to sign the written consent give the Court pause. Looking only at the statement that Defendant could not give consent to search the car because it was McLaughlin's car, one could conceivably conclude that Defendant was attempting to revoke the prior consent to search. The Court, however, cannot view the second statement in isolation. The verbal consent Defendant gave was unambiguous. Defendant then had an exchange with Officer Taylor regarding the delay the search might cause Defendant, who expressed that he was in a hurry to get to the alleged funeral. This exchange indicates that Defendant understood that he had previously given Officer Taylor oral permission to search the car.

The later statement that Defendant could not sign the consent form because it was not his car is equivocal as to whether Defendant was attempting to revoke his prior verbal consent. Furthermore, Defendant did not immediately object when Officer Taylor began his search, but instead watched the search and waited, in the interim asking Officer Byrd to retrieve a lighter from the vehicle being searched. See United Stated v. Hicks, 2009 WL 2026318, at *4 (E.D.N.C. May 28, 2009) ("[W]here the suspect's revocation of his consent is ambiguous . . . 'court's have generally relied upon the defendant's failure to protest the search in finding consent.'") (citations omitted). By the time Pena did object to the search, Officer Taylor had already discovered the marijuana, which established probable cause to continue the search. The Court finds that this a "close call," and is somewhat troubled by Officer Taylor's failure to clarify Defendant's intent. Nevertheless, based on all the facts and circumstances, the Court concludes that Officer Taylor's reliance on Defendant's clear verbal consent to search was not unreasonable and that the later

14

equivocal statements or refusal to sign the written consent form did not revoke or taint the earlier consent.

The Court recommends that Defendant's Second Motion to Suppress be denied.

## IV.   CONCLUSION

The Court **RECOMMENDS** that the Motion to Suppress [DE-16] be **DENIED** and that the Second Motion to Suppress [DE-17] be **DENIED**.

The Clerk shall send copies of this Memorandum and Recommendation to counsel for the respective parties, who have fourteen (14) days from the date of receipt to file written objections. Failure to file timely written objections shall bar an aggrieved party from receiving a de novo review by the District Court on an issue covered in the Memorandum and, except upon grounds of plain error, from attacking on appeal the proposed factual findings and legal conclusions not objected to, and accepted by, the District Court.

This the 11th day of December, 2009.

DAVID W. DANIEL
United States Magistrate Judge